[No. D007843. Fourth Dist., Div. One. Mar. 27, 1989.]

Conservatorship of the Person of ALYCE S. POLLOCK.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES,
Petitioner and Respondent, v.
ALYCE S. POLLOCK, Objector and Appellant.

## COUNSEL

Christopher Blake, under appointment by the Court of Appeal, for Objector and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Daniel J. Wallace, Chief Deputy County Counsel, Stephen R. Magruder and Grace Goodall, Deputy County Counsel, for Petitioner and Respondent.

## OPINION

**KREMER, P. J.**—Alyce S. Pollock appeals an order reestablishing her conservatorship under Welfare and Institutions Code,[1] section 5362, subdivision (b). She contends the court improperly treated her waiver of her presence and the presence of her attorney at the hearing as a stipulation the court could reestablish the conservatorship. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On February 16, 1988, Public Conservator Richard J. Thomson (Conservator) filed a petition to reestablish Pollock's conservatorship under the Lanterman-Petris-Short Act (LPS). (§ 5350 et seq.) The medical recommendation and declaration, signed by physicians A. Kent Williams and Thomas S. Whitelock, stated Pollock was suffering from senile dementia and was gravely disabled, rendering her "incapable of providing needed food, clothing, and shelter without supervision." The Conservator served a notice of hearing by mail on Pollock; her attorney, H. L. Roy Short; and Hillcrest Convalescent, where Pollock was apparently residing. At the hearing on March 3, Short was present, although Pollock was not, and the matter was taken off calendar.

On March 28, Short requested a hearing. He also filed a motion to dismiss or strike the Conservator's petition for lack of jurisdiction on the

---

[1] All statutory references are to the Welfare and Institutions Code.

grounds Pollock had not been "served with a copy of the Petition properly signed," in that the petition bore a facsimile signature stamp, rather than being personally signed by the Conservator as required by San Diego Superior Court rule 4.9; the physicians who made the medical declaration were not mental health experts; and there was no evidence they had examined Pollock or had adequate information to render an opinion. In addition, Short filed a "waiver of presence at hearing to reestablish L.P.S. conservatorship." This document stated: "1.   Counsel appears specially on the motion challenging jurisdiction.

"2.   [XXX]   (a) The conservatee was unable at this time to express to me a knowing and intelligent waiver of the hearing on the Petition to Reestablish Conservatorship set for 3-31-88.

"   [ ]   (b)   The conservatee represented to me that he/she did not want to attend a court hearing; did not oppose the reestablishment; did not object to the present conservator or desire another person be appointed as conservator.

"3.   The conservatee challenges the sufficiency of the requirements for presenting the petition and satisfaction with the requirements of establishing a conservatorship.

"3.   [*sic*]   Demand is made for a hearing on the motion and the Petition for Reestablishment. The conservatee requests a finding from the court that all required procedural requirements have been met, and that credible evidence supports a finding beyond a reasonable doubt to prove continued grave disability.

"4.   [*sic*]   Counsel has no objection to the court hearing the Motion, and if denied, the Petition to Reestablish Conservatorship, without the presence of counsel or the conservatee, thus waiving the physical presence of each."

At the hearing on March 31, neither Pollock nor Short was present. In addition to Pollock's case, Short had several others on calendar, apparently involving similar issues. The court stated: "With regard to those matters, what Mr. Short has done, I believe, in each one of them, he's filed his version of a waiver as distinguished from a stipulation. He has filed a motion to dismiss on procedural grounds. He waives his presence, his clients' presence, but not the doctors' presence, . . .

"And so the threshold question that I face in these matters is: may Mr. Short frame the procedures that he requires to be conducted, whether the

statute requires them or not, in a matter in which he presents no opposition? And I think not . . . section 5362(b) authorizes reestablishment of a conservatorship without a hearing and without the presentation of evidence unless someone demands a hearing.

". . . . . . . . . . . . . . . . . . . . .

"[T]here is a demand in form. Mr. Short demands hearings in all of these things; but in substance, he waives the essentials of a hearing; that is to say the opportunity to confront, the opportunity to contest, the opportunity to be present. The hearing would be nothing more than an idle ritual which he thinks should be put on in his absence because he believes . . . the reestablishment of conservatorships should require more substantial proceedings than the Legislature [has] seen fit to provide.

"I do not believe he has the power or the authority to do that. . . . I find and hold that what he has filed amounts to a waiver of a hearing, for all practical purposes. Accordingly, I may proceed under *5362[b]*.

"He raises an objection that there's lack of service. There's no verification of his allegation that there was no service on the conservatee, and interestingly enough, in each of these cases, he says that his client lacks the capacity to waive a hearing. I believe it follows that his client lacks the capacity to demand a hearing . . . there's an obvious truth, and that is, that a person who lacks the capacity to demand a hearing probably lacks some other capacity as well, like providing for such person's food, clothing, and shelter."

". . . . . . . . . . . . . . . . . . . . .

"What counsel really wants is that we should drag the doctor in, in each one of these cases and have him say what is in the declaration because counsel believes that the declarations are deficient." The court reestablished the conservatorship under section 5362, subdivision (b).

## DISCUSSION

■ Pollock concedes she was afforded proper notice and waived her presence and counsel's presence in court, but contends she neither waived the presence of the physicians who recommended the conservatorship be reestablished nor stipulated to reestablishment. Pointing out Short demanded a hearing under section 5362, she concludes the statutes required a hearing with testimony by the physicians.

Section 5361 provides upon the termination of a one-year conservatorship, the conservator may petition for reestablishment. The petition "must include the opinion of two physicians or licensed psychologists . . . the conservatee is still gravely disabled as a result of mental disorder . . . ." (§ 5361.) If there is adequate notice and no request for a hearing or jury trial, the court may reestablish the conservatorship without a formal hearing. (§ 5362, subd. (b); *Conservatorship of Moore* (1986) 185 Cal.App.3d 718, 723, 729-731 [229 Cal.Rptr. 875].) If any party asks, "there shall be a court hearing or a jury trial, whichever is requested, on the issue of whether the conservatee is still gravely disabled and in need of conservatorship." (§ 5362, subd. (a).) ▪ At the hearing, the conservator must prove grave disability beyond a reasonable doubt. (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 225-226, 235 [152 Cal.Rptr. 425, 590 P.2d 1].) The conservatee may call the physicians as witnesses (*Conservatorship of Delay* (1988) 199 Cal.App.3d 1031, 1036 [245 Cal.Rptr. 216]) or may waive their presence upon advice of counsel (§ 5365.1). In the case of a waiver, the physicians need not attend the hearing if the parties stipulate their recommendations and records concerning the conservatee's mental condition and treatment will be received in evidence. (*Ibid.*)

▪ Pollock, in effect, contends the court must conduct a sort of prove-up hearing. Recently, we addressed the constitutional due process principles surrounding proceedings to reestablish a conservatorship in *Conservatorship of Moore, supra,* 185 Cal.App.3d 718. In *Moore,* we concluded the statutory scheme provided adequate safeguards to protect procedural due process rights. We explained: "Procedural due process is a watchword, not the unwavering equivalent of a formal hearing. The question of whether due process has obtained can only be answered by scrutinizing the circumstances in which the deprivatory action arose. [Citations.] 'Because of the broad spectrum of concerns to which the term must apply, flexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error. [Citation.]'" (*Id.* at p. 728.)

We observed the United States Supreme Court tests the fundamental fairness of government decisionmaking under the Fourteenth Amendment of the federal Constitution by balancing three factors: "'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedur-

al requirement would entail. [Citation.]' " (185 Cal.App.3d at p. 729, quoting *Mathews* v. *Eldridge* (1976) 424 U.S. 319, 335 [47 L.Ed.2d 18, 34-35, 96 S.Ct. 893].)

■ We explained the California Constitution's due process provisions: " ' . . . generally [require] consideration of (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible government official, and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [Citations.]' " (185 Cal.App.3d at p. 729, quoting *People* v. *Ramirez* (1979) 25 Cal.3d 260, 269 [158 Cal.Rptr. 316, 599 P.2d 622].)

We concluded that while reestablishment of a conservatorship intrudes upon liberty interests, the reestablishment procedures employ "numerous checks against the risk of erroneous intrusion," including notice of the pending expiration of the conservatorship, notice when the conservator seeks reappointment, notice the reappointment can be opposed through a court hearing or jury trial and that the judge may, on his or her own motion, accept or reject the conservator's petition (§ 5362). (185 Cal.App.3d at p. 729.) ■ We further pointed out that even if the court could have acted erroneously, the conservatee's loss of liberty arguably would be de minimis; "[u]nder the conservatorship scheme, an ex parte reestablishment can *be directly and immediately* challenged under section 5362 and similarly challenged thereafter under section 5364 or anytime by writ of habeas corpus." (*Conservatorship of Moore, supra,* at p. 730, italics in original.) We concluded: "In sum, the ex parte reestablishment procedures available here provided constitutionally sound safeguards against error. Further, these procedures welcomed and encouraged Moore's participation in the conservatorship decision. His worth and dignity were not overlooked and indeed, the local rules ensured, through appointed counsel, direct communications with the court. It also allowed Moore to avoid a potentially uncomfortable and disruptive court appearance which, in light of his nonopposition to reestablishment, would have likely been brief and pro forma. [Citations.] Finally, the state's interest in employing conservatorships as a means 'to provide individualized treatment, supervision, and placement' (§ 5350.1) is also furthered by the ex parte reestablishment procedure. Not only were the costs of an otherwise unnecessary court appearance avoided, the human and economic resources necessary to prepare, transport and supervise Moore during a hearing were also conserved. In treatment and board and care facilities where both staffing and budgets are tight, this is by

no means insignificant. In this context, a footnote from *Parham* v. *J.R.* (1979) 442 U.S. 584 [61 L.Ed.2d 101, 99 S.Ct. 2493] is particularly apt: ' "It should be realized that procedural requirements entail the expenditure of limited resources, that at some point the benefit to individuals from an additional safeguard is substantially outweighed by the cost of providing such protection, and that the expense of protecting those likely to be found undeserving will probably come out of the pockets of the deserving." [Citations.]' (*Id.*, at pp. 605-606, fn. 14 [61 L.Ed.2d at pp. 120-121], citing Friendly, *Some Kind of Hearing* (1975) 123 U.Pa.L.Rev. 1267, 1276.) On reviewing all these interests, we find the balance struck in reestablishing a conservatorship ex parte when the conservatee chooses not to contest the proceeding offends neither the state nor federal constitutional requirements for due process. This holding clearly comports with the United States Supreme Court's ruling in *Codd* v. *Velger* (1977) 429 U.S. 624, 627-628 [51 L.Ed.2d 92, 96-97, 97 S.Ct. 882], where the court determined a hearing, otherwise mandated by the due process clause, was not necessary when the injured party did not contest the facts underlying the challenged deprivatory action. [Citation.]" (185 Cal.App.3d at pp. 730-731.)

██ Here, Pollock by waiving the presence of herself and her counsel at the hearing, essentially conceded she would not be contesting the facts. ██ The function of a hearing is to allow the proposed conservatee to contest the facts through confrontation and cross-examination of the conservator and recommending physicians and through presenting evidence on her own behalf. These methods of contesting the facts cannot occur if neither the conservatee nor her attorney are present at the hearing. If the conservatee will not be contesting the facts, then *Moore* teaches it is not necessary to hold a hearing "likely [to be] brief and pro forma" (*id.* at p. 730); the ex parte review by the court as well as other safeguards provided in the conservatorship scheme sufficiently insure against an erroneous deprivation of liberty. Further, as *Moore* points out, the benefit of providing the procedural safeguard should be balanced by the cost of providing such protection. ██ Here, the additional benefit Pollock might receive from a hearing where neither she nor her counsel are present and where she neither presents nor challenges is minimal at best and substantially outweighed by the cost of providing a hearing, e.g., requiring court appearances by the conservator and physicians (to the detriment of their other conservatorship responsibilities) and using scarce judicial resources.

We conclude Pollock, by declining her right to have herself and/or counsel appear at the hearing, admitted she was not opposing reestablishment of the conservatorship, the literal language of her waiver notwithstanding. Under these circumstances, the court was justified in reestablishing the conservatorship.

## DISPOSITION

Judgment affirmed.

Todd, J., and Huffman, J., concurred.